**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| ASCENT MANAGEMENT, INC.; MARWAN DEEK | Case No._____ |
| *Plaintiffs* | (Judge                    ) |
| v. | |
| SHELL OIL COMPANY; SHELL LEASING COMPANY; SHELL PETROLEUM INC.; TRUE NORTH ENERGY INC.; PETROLEUM SOLUTIONS INC.; VERIFONE. | VERIFIED COMPLAINT FOR COMPENSATORY AND PUNITIVE DAMAGES AND OTHER RELIEF |
| | JURY TRIAL DEMANDED |
| *Defendants* | |

## <u>INTRODUCTION</u>

1. Plaintiffs are the owners and operators of a gas station and convenience store located on North Main Street in Dayton, Ohio.

2. Plaintiffs operate under the banner of Shell and sell convenience store items and gas via and pursuant to the contractual terms and conditions required by Defendants True North and Shell Oil Company.

3. Plaintiffs, by contractual terms and terms of business, are required by Defendants True North and Shell to comply with and use only those systems, software, hardware, processes and equipment dictated and/or permitted by said Defendants.

4. Plaintiffs are not allowed to use any equipment or software not authorized or selected by Defendants.

5. On or about early February 2020, Defendants required Plaintiffs to purchase and retain Defendants' authorized and/or contracted service providers to provide and install software, hardware and other system updates [the hardware, software and integration thereof together hereinafter will be referred to collectively as "the Updates"] as a condition of doing business.

1

6. The Updates were required by the terms of agreement between the Parties, and for the benefit of all named Defendants.

7. The Updates were defective in that they caused Plaintiffs' system to fail to finalize customer credit card transactions and purchases made on Register #2 each and every day, from the date of installation (February 25, 2020), until at least January 5, 2021.

8. Plaintiff apprised all Defendants that the Updates were causing a defect in Plaintiffs' Register #2 and Plaintiffs' business operations almost immediately from when they were implemented, and repeatedly thereafter.

9. Defendants were also informed by third parties of said defects by or before the Spring of 2020, yet they failed to disclose this information to Plaintiffs.

10. Defendants produced secondary upgrades to remedy the malfunction in the Updates by at least early Spring 2020, and failed to inform, and concealed said information from Plaintiffs.

11. Defendants took no action to remedy the defect in the Plaintiffs' Updates.

12. Defendants' actions caused severe economic and non-economic loss to Plaintiffs, including, but not limited to, loss of income and/or merchandise, damage to reputation, damage to goodwill, loss of customers, increased operating costs, increased labor, increased cost to accommodate the unresolved defect, special expenses, pecuniary losses, undue stress (especially during the height of the Covid-19 pandemic), damage to the relationship between Plaintiffs and their employees, loss of business opportunity, attorneys' fees and other losses which total at least two-million two-hundred and fifty-five thousand and eight hundred and sixty dollars and ninety-two cents ($2,255,860.92).

## **PARTIES**

13. Plaintiff Ascent Management is a C Corporation registered to do business and formed in the State of Ohio, with its' principal office in Columbus, Ohio, and doing business as "Siebenthaler-Shell."

14. Plaintiff Marwan Deek is the principal of Ascent Management and is a resident and domiciliary of Columbus, Ohio.

15. All Defendants are foreign corporations which engage in interstate commerce and operate in Ohio.

16. Shell Leasing Company, Shell Oil Company, Shell Petroleum Inc. are subsidiaries of Royal Dutch Shell. All Shell Defendants shall be referred to singularly as "Shell."

17. Defendants Shell is a Delaware corporation with its principal offices and place of business in Houston, Texas.

    a. Shell is a vertically-integrated international company involved in every area of the oil and gas industry, including, but not limited to: production, refining, transport, distribution and marketing, petrochemicals, power generation, trading, software and hardware products, technical services, including EPOS and credit card processing systems, and the like.

    b. Defendants Shell manufacture, develop, produce and distribute, to Plaintiffs and others, software and hardware to support and sustain Shell's credit card processes and gas distribution systems to retailers.

    c. Defendants Shell develop and mandate distribution of policies and systems which Plaintiffs and others similarly situated must adopt to do business with Shell.

    d. Defendants Shell provide "Support Services" to ensure and facilitate proper functioning of said systems to Plaintiffs and others similarly situated.

18. Defendant True North Energy ["TNE"] is a partially owned subsidiary of Defendants Shell.

19. Defendant TNE is a foreign limited liability corporation, organized under the laws of the State of Delaware and registered to transact business in the State of Ohio, with its principal office in Ohio located at 5565 Airport Highway, Toledo, Ohio 43615.

20. Defendant TNE is known as a Shell exclusive "jobber" (distributor/wholesaler).

    a. Defendant TNE is contracted with Defendants Shell to sell gas, hardware, and software to Plaintiffs, and others similarly situated, and to effect and ensure the implementation of Shell's requirements, processes and standards-- and does itself operate and manage a large chain of gas station/convenience stores.

    b. Defendant TNE is the intermediary between Plaintiffs and Defendant Shell.

    c. Defendant TNE and Shell have agreements and contracts with each other and the remaining Defendants to develop, manufacture, install, integrate and implement hardware and software to facilitate their ability to distribute gas to retailers, like and including Plaintiffs, and to secure payment from retailers.

    d. Defendant TNE has a contract with retailer Plaintiffs to provide the above listed services, in exchange for Plaintiffs' compliance with its terms and for financial consideration.

    e. Shell is a necessary party to the contract between TNE and Plaintiffs, and dictates the terms and process and equipment which Defendants Shell require Plaintiffs to use.

    f. At all times, Plaintiffs complied with its obligations under the contracts with, and terms of business set by, Defendants TNE and Shell.

21. Defendant Petroleum Solutions, Inc. is also knowns as "Jones & Frank" and does business as "JF Petroleum" [hereinafter "JF Petrol Group"].

22. Defendant JF Petrol Group is a Texas corporation with its principal place of business in McAllen, Texas.

a. Defendant JF Petrol Group sold to Plaintiffs a Cybera Router, other equipment, software and services to install and integrate the Updates, from its' office located at 100 Perimeter Park, Suite H, Morrisville, NC 27560, and later installed same at Plaintiffs' place of business.

b. Plaintiffs paid to Defendant JF Petrol Group approximately $90,000.00 for hardware, software and installation- of that, approximately $1,682.92 was specifically for software and installation thereof.

   i. Said software and installation was done and developed by or under the instruction of Defendants Shell and/or Verifone.

c. Defendant JF Petrol Group is contracted and/or an agent of Defendant Verifone to install and service the Updates.

d. Defendant JF Petrol Group is contracted with and/or an agent of Defendants Shell.

e. Defendant JF Petrol Group is contracted with and/or an agent of Defendant TNE.

f. Defendants Verifone, and/or Shell, and/or TNE contract with Defendant JF Petrol to vend, install, and integrate hardware and software systems to Plaintiffs to accomplish the goals, needs, and requirements of said Defendants.

g. Defendant JF Petrol Group touts itself as a "Fueling Equipment Solutions provider, [and] national leader in fuel handling systems [who employ] more than 1,000 of the industry's best and brightest, we have grown to be the largest complete solution provider serving fuel system owners and operators across North America. [Serving as] a trusted partner, offering the most comprehensive range of products and services at the highest quality and a great value."

h. Defendant Petrol Group installed Register #2 for Plaintiffs.

23. Defendant Verifone is a Delaware corporation that maintains its headquarters and principal place of business in San Jose, California.

a. Defendant Verifone is a multinational business that designs, manufactures, markets, supplies, and sells electronic payment products and provides related services- and does itself operate and manage a large chain of gas station/convenience stores.

b. Defendant Verifone's products include point-of-sale payment terminals and associated software and solutions that enable credit and debit card transactions.

c. Defendant Verifone is one of the world's largest point-of-sale terminal vendors.

d. Defendant Verifone is the sole provider that Plaintiffs are allowed to use (by dictates of Defendants Shell and Verifone) of the Cybera Secure Router, over which secure credit card processing communications travel.

e. Defendant Verifone sold Register #2 to Plaintiffs.

f. Defendant Verifone's systems produce some, most or all of the receipts, reports, and logs to Plaintiffs and to Plaintiffs' customers.

g. Defendant Verifone's systems produce said receipts, reports, and logs in coordination with or by way of Defendants Shell.

h. Defendant Verifone sells its services and products to Plaintiffs, and those similarly situated, directly and by way of contracts with re-sellers.

     i. Defendant Verifone is contracted with Defendants Shell and TNE for the production, manufacturing, and installation of software, hardware, and integration systems for use by Plaintiffs and those similarly situated.

     j. Defendant Verifone is contracted with Defendant JF Petrol Group for the installation, development, sales and servicing of its products to Plaintiffs and others similarly situated.

     k. Defendant Verifone alone and/or with Defendant Shell provides technical support services to Plaintiffs and those similarly situated.

## JURISDICTION AND VENUE

24. Federal jurisdiction exists over this action under 28 U.S.C. §1332(a)(1) because the parties are citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

25. Venue and jurisdiction are proper because Defendant(s) transacted business and contracted to supply goods and services in Montgomery County, because a substantial part of the events or omissions giving rise to Plaintiffs' causes of action against Defendant(s) occurred in Montgomery County, and because Plaintiffs have their principal place of business in Montgomery County.

26. No application for the damages requested herein has been filed in any other court of competent jurisdiction

## FACTUAL ALLEGATIONS

A.    TIMELINE, NOTICE, PLAINTIFFS' INVESTIGATIONS:

27. Plaintiffs incorporate all of the foregoing statements and allegations as though fully restated herein.

28. Plaintiffs entered into business with Defendants TNE and Shell on or about 2007.

29. Plaintiffs, at the direction and/or mandate of Defendants TNE and Shell, began procuring the services, software, hardware and integration system of Defendants Verifone on or about 2007.

30. Plaintiffs, at the direction and/or mandate of Defendants TNE and Shell, began procuring the services, software, hardware and integration system of Defendants JF Petrol Group beginning on or about February 1, 2020.

31. Since the inception of their relationship with all Defendants, Plaintiffs complied with all the requirements, mandates, terms, instructions, operational requirements, and fulfilled their obligations to all Defendants.

32. Plaintiffs cannot do business without complying with the requirements and conditions stated above.

33. Said compliance is a condition and the basis of the agreement between Plaintiffs and Defendants TNE and Shell and Verifone.

34. Said compliance serves the primary purpose of ensuring that monies are taken from Plaintiffs and its customers and is securely sent to the financial accounts of Defendants Shell and TNE.

35. In fact, when Plaintiffs sell their own merchandise to customers, customer payments/monies are *first* directed to Defendants Shell, TNE and/or Verifone, then together these Defendants reimburse Plaintiffs for the sales several days after such sales are made by Plaintiffs, through processing and accounting systems which these same Defendants also solely control.

36. In approximately October 2019, Defendants TNE and Shell required Plaintiffs, and those similarly situated, to implement the Updates to their hardware and software and processes, which are called the "EMV systems."

37. Said updates included but were not limited to installing new gas pumps, software, routers, and integrations systems.

38. On or about January 7, 2020, Defendant TNE sent a letter directing Plaintiffs to install new mandatory updates or face fines and liabilities.

39. Defendant TNE sent the letter in coordination with, and on behalf of, Defendants Shell.

40. On or about January 7, 2020, Defendant TNE issued letters stated in part,

*"Beginning October 1, 2020: Shell and True North's fraud policy will be updated to coincide with the shift in responsibility. All True North Dealer locations that are not fully EMV operational will be responsible for all outdoor fuel dispenser counterfeit and lost and stolen fraud until the location becomes fully EMV operational. All True North Dealer locations that are not fully EMV operational by October 1, 2020 will also be required to deposit Twenty-Five Thousand Dollars ($25,000.00) with True North. The deposit will be held by True North until such time as the Dealer location becomes fully EMV operational. True North also reserves the right to increase the deposit level at any time. In addition, True North also reserves the right to shift all EMV liability sooner than October 1, 2020 should a location experience excessive counterfeit fraud prior to this date. True North has communicated to you on multiple occasions including a presentation in May, 2019, that the credit card company and Shell has required EMV operational changes with specific deadlines. It is your responsibility to upgrade your location's EMV equipment prior to October 11, 2020. Do not wait. Time is running out. Should you have any questions, please contact your area District Manager*

*Sincerely, Mark E. Lyden, President/CEO"*

41. Sometime on or about the end of January 2020, Plaintiffs reached out to Defendant TNE-as directed in TNE's letter- to inquire about the Updates and to ask which service providers to retain to purchase the needed equipment, to install same, and to integrate the updates via software and processes as needed.

42. Defendant TNE informed Plaintiffs to retain Defendant JF Petrol Group because they are "experts in the Gilbarco pumps" which are part of the required Updates.

43. In approximately early February 2020, Plaintiffs retained and paid Defendant JF Petrol Group to undertake the provision and installation of hardware and software Updates.

44. On or about February 25, 2020, Defendant JF Petrol Group informed Plaintiffs that the Updates were complete and in good working order.

45. Beginning on or about February 25, 2020, Plaintiffs noticed that Register #2 was no longer able to receive and process its customers' "Shell loyalty rewards cards."

46. Register #2 was purchased by Plaintiffs from Defendant Verifone and subjected to software and integration Updates which were installed by Defendant JF Petrol Group and developed by Defendant Verifone under the direction, and/or in collaboration and coordination with Defendants Shell.

47. Register #2 is connected to and integrated with Defendant Shell and Defendant TNE's systems, servers, hardware, and software.

48. Plaintiffs' employee called Defendant Verifone on or about February 25, 2020 to inform them of the issue and seek a solution to rectify it.

49. Defendant Verifone informed that they could not see any errors from their end and that they had to send Plaintiffs to a higher level of support, *i.e.*, to Shell-Verifone Support- who then informed Plaintiffs that they could not fix the issue and that a Verifone-Shell Support Manager would call Plaintiffs.

50. Plaintiffs continued calling Defendants Shell and Verifone on several occasions and received no response and no remedy for their grievance regarding the malfunction.

51. Plaintiffs were informed that there were no error or malfunctions on their end.

52. Plaintiffs continued calling Shell-Verifone Support on several occasions and, as before, received no response and no remedy for their grievance regarding the malfunction and were informed that there were no error or malfunctions on their end- and that a manager would call them back.

53. Plaintiffs continued calling Defendants Verifone and Shell-Verifone support on a near daily basis until approximately March 19, 2020.

54. Defendants Verifone and Shell offered no remedy and the Verifone-Shell support manager never called Plaintiffs as had been promised.

55. On or about March 19, 2020, Plaintiffs called Defendant JF Petrol Group for assistance. JF Petrol Group offered tips to see if they can fix the malfunction on Register #2; however, said Defendant(s) failed to do so.

56. JF Petrol Group then traveled to Plaintiffs' place of business to attempt to fix Register #2, and produced a ticket stating,

> "3/19/20 MAE ARRIVED ON SITE SPOKE WITH SITE OWNER ABE. ABE STATES PIN PAD 2 WAS NOT TAKING LOYALTY. TESTED FOUND LOYALTY DECLINE. CONTACTED SHELL AND WAITED ON HOLD AFTER REP ANSWERED INFORMED REP OF THE ISSUE AFTER TROUBLESHOOTING REP STATED SHE FOUND THE ISSUE AND TO REBOOT PIN PAD AND TEST. REBOOTED AND TESTED FOUND LOYALTY TO WORK. SITE OWNER CAME OUT AND INFORMED ME A CUSTOMER JUST TRIED FUEL LOYALTY AND IT STATES DECLINED AGAIN. CONTACTED SHELL AGAIN TROUBLESHOT WITH REP WHO HAD ME REBOOT PIN PAD AND REGISTER AS WELL AS COMMANDER. AFTER SOMETIME REP STATES SHE WILL ESCALATE ISSUE AND CONTACT ME BACK. AFTER SPEAKING WITH ABE HE STATED SHELL WILL TAKE ALL DAY CALLING ME BACK IF THE ISSUE DOES NOT CLEAR UP BY MONDAY HE WILL CALL BACK IN. TESTED ALL OK. JF"

57. Register #2 still failed to accept Shell Loyalty Cards thereafter.

58. Plaintiffs called JF Petrol Group again to see what solutions they or Shell-Verifone support and/or Shell Level 2 support could provide- and were told by JF Petrol Group that they could not detect any issues on their end and that Verifone-Shell had not returned their calls about this matter either.

59. Plaintiffs continued calling Verifone and Shell-Verifone Level 2 support.  Both informed Plaintiffs that they could see no errors from their end and that they could not fix the problem.

60. Shell-Verifone support again informed Plaintiffs that a manager would call them back but said manager never called Plaintiffs.

61. Plaintiffs then contacted JF Petrol Group to see what solutions they could provide.

62. JF Petrol Group said there was "nothing they could do from their end," and that Defendants Verifone and/or Verifone-Shell support and/or Shell support Level 2 were still refusing to call them back regarding the issue.

63. Plaintiff continued calling JF Petrol Group for several weeks thereafter and were told that "there was no issue on our end" and that Shell had not responded to their requests for assistance.

64. Defendants Shell never contacted Plaintiffs about this or any other malfunction.

65. Defendant Verifone never contacted Plaintiffs about this or any other malfunction.

66. Plaintiffs then reached out to local TNE representative, who advised Plaintiff to call Shell support.

67. Plaintiffs again called Defendants Shell and JF and Verifone to no avail until on or about mid-April 2020.

68. Plaintiffs continued to complain about the Register #2 malfunction to TNE throughout the year- and were "ping-pong'ed" between the Defendants, none of whom offered Plaintiffs any information, solution, or meaningful response.

69. All named Defendants failed and/or refused to solve the problem of the failure of Register #2 to receive "Shell Loyalty Cards."

70. During all calls and at all times, each Defendant represented that its' systems, software and the Updates were in good working order, had no malfunction and were working just fine- and blamed the other Defendants for any issues Plaintiffs were having- or otherwise told Plaintiffs to await the call of a manager.

71. Defendants caused Plaintiffs to believe the malfunction was unsolvable from their end.

72. Plaintiffs were thereafter forced to adjust their operations, at Plaintiffs' expense and loss, so that "Shell Loyalty Cards" would be received only on Register #1.

73. As this was the beginning of the Covid pandemic, and there was an increase in sales to the local community- who were looking to save as much money, travel and exposure as possible, the failure of Register #2 to accept Shell Loyalty cards caused frustration to Plaintiffs' customers for the delays and caused loss of business and goodwill to Plaintiffs.

74. This caused increased stress to Plaintiffs and their business operations and their employees. This also caused loss of time and increased stress to Plaintiff Deek.

75. By late Spring 2020- and during the height of the Covid pandemic- Plaintiffs noticed that although they were busier than ever, they were suffering severe financial loss.

76. In approximately late Spring of 2020, Plaintiffs began to investigate the possible causes for the financial loss, by investigating and monitoring potential customer and third-party theft of merchandise.

77. Plaintiff Deek set aside time and energy from his new business venture to monitor the subject business operations.

78. This caused financial losses to Mr. Deek's new business venture, causing him psychological stress, financial loss, and loss of business opportunity. It further distracted him from managing his new business venture, costing him approximately $400,000.00 over the course of the following nine (9) months.

79. The monitoring of customers damaged Plaintiffs' relationships with its customers and its' associated resultant goodwill.

80. Plaintiff Deek reviewed and monitored the store's surveillance footage 24 hours per day 7 days a week, took to reconciling surveillance footage with daily end of shift reports and reconciling all with merchandise reports, logs, and cash receipts- but could not find any signs of theft or break-ins that could explain the financial losses.

81. All said receipts, reports, and logs were produced by Defendants Verifone and Shell.

82. All said reports, receipts and logs (erroneously and falsely) indicated that the Updates and Defendants' EPOS and credit card processing systems were in working order- and that none of the credit card or other transactions had failed.

83. After spending hundreds of hours of reviewing and reconciling the reports with surveillance footage, Plaintiff Deek began monitoring and restricting employee movements and operations, scrutinizing orders, invoices, wholesalers, sales and employee reports and activity.

84. These measures damaged Plaintiffs' relationship with their employees.

85. Plaintiff Deek again returned to a daily review of cash register receipts and end of shift reports and compared them to surveillance footage of sales to ensure that what was sold was reported on said receipts.

86. Plaintiff Deek expended hundreds of hours poring over gas station surveillance footage and register receipts.

87. All records, reports and receipts produced by Defendants' systems and made available to Plaintiffs and Plaintiffs' customers, indicated that Defendants' systems were properly operating and did not indicate any malfunction or failed transactions.

88. At the height of the pandemic, and as a result of the severe loss of his business, coupled with his new business venture suffering for lack of his ability to monitor and invest in it, Plaintiff Deek undertook to learning the detailed mechanics of Defendants' systems.

89. Plaintiff Deek believed the financial loss had to be caused by Defendants' systems because the only thing that was clear from his investigations was that his losses began at

the same moment Defendants forced Plaintiffs to purchase and install the subject Updates.

90. After several weeks, and dozens of hours of self-education, Plaintiff Deek learned that he could download raw data reports from Defendant Verifone's systems and analyze them.

91. Plaintiff Deek then began downloading raw data reports of all the transactions from Defendants' Verifone system [hereinafter the "VF-Shell Reports" and/or "VFSR"] which record the mechanics of the Verifone-Shell processes.

92. The VSFR is a report that uses numerical codes instead of words in giving accounting details and reports.

93. Plaintiff Deek pored over the raw data reports for numerous weeks attempting to decode and understand them.

94. By approximately January 4, 2021, Plaintiff Deek was able to see that a set type of transaction was being reclassified as "drive-offs."

95. Plaintiff Deek reconciled a sample of "drive-offs" with surveillance footage and cash register receipts and found that the customers had not driven off, but to the contrary had gone into the gas station and "paid" for the purchases- except that said purchases were not finalized by Defendants' systems.

96. Specifically, customer purchases of both gas and merchandise paid for at Register #2 and finalized when the gas pump was returned to its original position as the customers exited ["Customer Transaction Type C"] were failing because Defendants' systems were marking said transactions as "drive offs" and therefore not charging customers' credit cards for same.

97. Plaintiff Deek also discovered that this defect began at the exact moment Defendants caused the Updates to be installed in Plaintiffs' place of business, *i.e.*, February 25, 2020.

98. Plaintiff Deek then called and emailed TNE to explain to them what was happening seeking an immediate remedy of his losses to he can keep his business operating.

99. Defendant TNE eventually told Plaintiffs to call Verifone.

100. Plaintiff Deek spent approximately four (4) hours on the phone with Verifone explaining to them what was happening and trying to get resolution of the malfunction to stop further financial loss.

101. VeriFone's remote attempts to upgrade Plaintiffs' software failed, and they told Plaintiffs to secure another technician to appear on-site to fix the malfunction.

102.     An authorized Shell-Verifone technician appeared and attempted to fix the Register by adjusting its software and installing the secondary upgrade developed by Defendants Verifone-Shell months prior.

103.     This only made the Register further malfunction, such that it became an unresponsive "brick" and had to be replaced.

104.     This secondary software upgrade was issued by all or some of the Defendants some time in or before June 2020, and was developed, by Defendants Shell and Verifone, to correct known malfunctions to the Updates.

105.     None of the Defendants told Plaintiffs of this secondary software upgrade or of the malfunctions that led to said upgrade during Plaintiffs' calls- or generally.

106.     None of Defendants' systems caused or requested download or installation of said secondary software upgrades.

107.     Plaintiffs then called Defendants Shell, informed them of Plaintiffs' discovery of the defect, and informed that Plaintiffs had suffered direct losses of hundreds of thousands of dollars as a result of the defects caused by Defendants.

108.     Defendants Shell offered to allow Plaintiffs to charge back the failed charges for two weeks.

109.     After further pleading by Plaintiff Deek, Defendants Shell told Plaintiff Deek they could allow him to charge back un-finalized charges for sixty (60) days.

110.     Defendants Shell charge-back period resulted in Plaintiffs undertaking another excruciating work scramble.

111.      After months of undue stress, tension, sleepless nights, missed family time, loss of other income and business opportunity, and near torturous labor to save his business, Plaintiff Deek was then forced to scramble to mitigate the damages caused him by Defendants' errors and omissions over the past year.

112.     The back charge process required inordinate labor and time, as it required Plaintiff Deek to pore over every individual receipt, scan every receipt one by one, and type in each credit number- all by hand.

113.     During those following days, Plaintiff Deek toiled 18-20 hours per day, seven days per week, to recoup as much financial loss caused by Defendants as possible.

114.     Plaintiff Deek's emotional, physical, and psychological health- and his new business venture- only further suffered.

115.     The back charge process also required Plaintiffs to charge their customers for transactions that happened months ago, making it appear as though Plaintiffs were stealing money from their own customers' cards, and charging them for unauthorized transactions, *i.e.*, that Plaintiffs were engaged in theft of their customers' funds.

116.     Plaintiffs' customers appeared at Plaintiffs' place of business yelling and accusing Plaintiffs of theft. Plaintiffs were forced to expend further resources on customer grievances and relations, customers were lost, and Plaintiffs were damaged in their reputation and goodwill in the community as a result.

117.     Plaintiffs again asked for assistance to recover their damages.  Defendants declined and ignored Plaintiffs' request.

B.     <u>DENIAL, CONCEALMENT & NEGLECT:</u>

118.     Plaintiffs incorporate all of the foregoing statements and allegations as though fully restated herein.

119.     Defendants knew and should have known of the defect set forth herein from at least February 25, 2020.

120.     Defendants were aware of the defect in the Updates since at least February 25, 2020, when Plaintiffs promptly notified them upon learning of the issues in Register #2 discussed herein.

121.     Defendants were made aware of said defects on multiple occasions thereafter as Plaintiffs called them on a near daily basis for weeks, and then continued calling throughout the year.  Defendants were also made aware of general and other malfunctions in the Updates by third parties.

122.     In fact, Defendants Verifone and Shell developed and distributed secondary upgrades specifically to correct various malfunctions similar to those faced by Plaintiffs.

123.     All Defendants knew, and/or should have known, of the secondary update which were required to correct malfunctions in the Updates by or before May 2020.

124.     At all times between February 25, 2020 and January 5, 2021, Defendants affirmatively represented that all systems, equipment and software were in good order and working "just fine," that there was "no issue on our end," and/or punted Plaintiffs' grievances and requests for assistance over to the other Defendants, each informing that "the problem is not from our end."

125.     Defendants and their systems produced reports, receipts, records and logs from Register #2, all of which erroneously reported that every transaction from February 25, 2020 through January 5, 2021 had been processed, and that Defendants' systems and the Updates were working properly.

126.     Defendant Shell-Verifone support manager(s) otherwise refused to take and refused to return Plaintiffs' calls (from February 25, 2020, through January 5, 2021) regarding Register #2- the same Register which was causing credit card transactions to fail.

127.     Defendants concealed and failed and/or refused to inform Plaintiffs of the defects in the Updates and failed and refused to take meaningful measures to investigate and remedy the malfunctions in the Updates.

128.     At no time during the period beginning February 25, 2020 through January 5, 2021, did the Defendants inform Plaintiffs of any other required software upgrades.

129.     At no time during the period beginning February 25, 2020 through January 5, 2021 did the Defendants inform Plaintiffs of any known or suspected defects or malfunctions in their equipment and/or software.

130.     At all times between February 25, 2020 until January 5, 2021, Defendants affirmatively denied that there were any defects in their systems, equipment and software.

131.     At all times between February 25, 2020 and until January 5, 2021, Defendants concealed from Plaintiffs the fact that their systems and the Updates were malfunctioning.

132.     At all times from February 25, 2020 through January 5, 2021, Defendants Shell, Verifone and TNE evaded Plaintiffs' request for further assistance, remedy, and information.

133.     Defendants evaded Plaintiffs' reasonable requests in breach of their contracts and agreements with Plaintiffs.

134.     Defendants' evasions, misrepresentations, omissions, denials, and concealment of the defects, combined with the reliance by Plaintiffs and the complexity of Defendants' systems, precluded Plaintiffs from further mitigating their damages or seeking third-party assistance to solve the issues.

135.     As a result of Defendants' acts, negligence, concealment, fraud and omissions, Plaintiffs were severely damaged, as detailed herein.

136.     Defendants are jointly and severally liable for the damages caused to Plaintiffs by the malfunctioning Updates they mandated and installed.

C.     <u>ROLES AND RELATIONSHIPS</u>:

137.     Plaintiffs incorporate all of the foregoing statements and allegations as though fully restated herein.

138.     Plaintiff Ascent shares a contractual relationship with Defendants TNE and Shell.

139.     Plaintiff Deek does not hold a college degree, is aged 48 years, is a husband and father of three young children- and has no training or degree in internet or software technologies.

140.     Defendant TNE, on behalf of and/or with Shell Oil Company, mandates Plaintiffs to use Defendants JFE, Verifone and a number of other services, service providers, and equipment, including but not limited to a "Wincor Box", a Zone Router, gas pumps registers, software, hardware, EPOS systems, integration systems, and the like.

141.     Defendants Shell and TNE required that Plaintiffs abide by Defendants' restrictive terms in Plaintiffs' business operations and Plaintiffs did so comply.

142.     These restrictive terms include but are not limited to:

   a.  Mandating Plaintiffs to make purchases and hire agents selected and dictated by Defendants;
   b.  Mandating the Updates be implemented by Plaintiffs via vendors and technicians exclusively selected by Defendants;
   c.  Mandating that Defendants Shell, TNE and Verifone control and receive income generated by Plaintiffs from their in-store sales;
   d.  Mandating Plaintiffs to send income produced from their sales first to Defendants Shell and/or TNE and/or Verifone;
   e.  Mandating that Plaintiffs turn over full control and rely on Defendants' credit card processing and EPOS systems and accountings and accounting mechanisms;
   f.  Mandating that Plaintiffs use only Defendant Verifone and/or Defendants Shell-produced hardware and software for secure credit card processing.

143.     As such, Defendants had and continue to have superior control and knowledge of all systems as compared to Plaintiffs- as they exerted full and near total control over Plaintiffs' EPOS, credit card, accounting and payment disbursement systems.

144.     Defendants' control and superiority is heightened by the fact that Defendants' systems were complicated and deeply integrated with each other, and that Plaintiffs could at best guess about their overlaps.

145.     Defendants' products, systems, services, and equipment are integrated with each other and require each of the Defendants and their employees, agents and contractors to coordinate and communicate with each other about the functionality and requirements of said systems.

146.     Defendant TNE is contracted with, and/or and agent, and a subsidiary of Defendants Shell.

147.     Defendant Verifone is an agent and/or contracted with Defendants TNE and/or Shell.

148.     Defendant JF Petrol Group is an agent of and/or contracted with Defendants Verifone, Shell and TNE.

149.     Plaintiff purchased the software, services, and equipment from Defendants Verifone and JF Petrol Solutions that were used for the Updates.

150.     The subject registers, routers, equipment, software, and gas pumps were sold by Defendants and their authorized agents to Plaintiffs.

151.     Plaintiffs are not allowed to use any alternate vendors or service providers without authorization or direction from Defendants and their authorized agents.

152.     Plaintiffs wholly rely upon the equipment, services and representations made by Defendants TNE and Shell about Defendants Verifone and JF Petrol Group.

153.     Defendants Shell, Verifone and TNE offer technical support to Plaintiffs and Plaintiffs have no choice but to use and rely solely on said support services.

154.     Plaintiffs are mandated to rely upon the representations and requirements of all named Defendants as a condition of Plaintiffs' contracts and relationships, and as a pre-condition of doing business through and with, Defendants Shell and Defendants True North.

155.     Defendants' products, systems, services, and equipment are integrated with each other and require each of the Defendants and their employees, agents, and contractors to coordinate and communicate with each other about the functionality and requirements of said systems.

156.     Plaintiffs are also forced to rely on Defendants' expertise because Defendants' systems, software and hardware operate in a manner that, absent specialized expertise, the Plaintiffs, and all others similarly situated, could not review or inspect them- other than by reports generated by the Defendants themselves.

157.     Defendants knew that Plaintiff was relying on Defendants systems, software and equipment- and their technical support services, and that such reliance was reasonable.

158.     Defendants represented themselves or each other as experts in the systems and the Updates they required Plaintiffs to undertake and/or purchase.

159.     Defendants knew that Plaintiffs had no independent means of inspecting or discovering the nature of the Upgrade's defects, other than by reporting any malfunction to the Defendants and by reviewing Defendants' produced reports, receipts and accountings.

160.     Defendants enjoyed a position of superiority and influence over Plaintiffs as a result of the trust and reliance placed in Defendants by Plaintiffs- and as a result of their superior knowledge of the Updates.

161.     Defendants are "so heavily involved" in vending and managing Plaintiffs' point of sales systems, that they created a special relationship between them and the Plaintiff.

162.     Plaintiffs' reliance was reasonable, mandated, intended by, and foreseeable to Defendants.

163.     Plaintiffs are the intended beneficiaries and recipients of the services, equipment, systems and Updates of Defendants.

164.     Defendants knew that Plaintiffs were wholly reliant upon the Defendants' representations, expertise, skills and judgment as regards the EPOS and credit card processing systems, and as regards the Updates and their installation. In fact, the Defendants had crafted Plaintiffs' total reliance for the purpose of also controlling receipt, disbursement, and allotment of income from and to Plaintiffs.

165.     The relationship between Plaintiffs and Defendants as regards equipment, systems and software is "one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust."

166.     Assuming *arguendo* that Plaintiffs had an opportunity or obligation to inspect the Updates- beyond the reports produced by Defendants and their systems- Defendants made such inspection and discovery impossible by their repeated denial and concealment of the malfunctions in their systems;  by way of reports that affirmatively represented that the transactions had been processed;  and by way of their evasion of Plaintiffs' repeated requests for help.

167.     Defendants can neither disclaim nor limit warranties.

168.     Defendants acted in an unconscionable manner in concealing and failing to inform Plaintiffs of the malfunction in their systems, in failing to inform Plaintiffs of the secondary updates developed as a result of their knowledge of that malfunction, and in failing to remedy the malfunction made all the more unconscionable in context of the power dynamic crafted by the Defendants.

169.     But for, and as a direct result of, Defendants' negligent and deceptive conduct, Plaintiffs would not have installed, maintained and purchased products which carried such significant risk of damage to Plaintiffs' business when used as (repeatedly) directed by Defendants.

170.     Defendants' actions, omissions, concealment, fraud and negligence caused economic and non-economic damage to the Plaintiffs, as set forth herein.

171.     When liability, reliance, mandated reliance, and obligation to comply is part of the bargain it therefore follows that remedy must be part of the bargain between the parties.

172.     Defendants are jointly and severally liable for their own actions and/or under the doctrine of *respondeat superior* for all damages suffered by Plaintiffs as outlined herein.

## CAUSES OF ACTION

## I.     NEGLIGENCE:

173.     Plaintiffs incorporate all of the foregoing statements and allegations as though fully restated herein.

174.     Defendants represented to Plaintiffs that the Updates were an improvement to EMV, credit card processing and security systems; that they were mandatory; and that failure to install the Updates would lead to issuance of fines and increased liability to Plaintiffs.

175.     Defendants owed a duty of reasonable care to Plaintiffs to ensure that the Updates, their equipment, software, agents and service and support providers would be developed, sold, installed, and work in a manner that ensured the integrity of the Plaintiffs' EPOS and credit card processing- and to ensure that Plaintiffs would receive proper technical support to ensure same.

176.     These duties arose by way of contract, special relationships, and by way of sale of said services to Plaintiffs as outlined herein.

177.     Defendants breached the duties they owed Plaintiffs when they negligently developed, managed, and installed the Updates of equipment and software to Plaintiffs' business.

178.     Defendants breached their duties to Plaintiffs when they failed to provide Plaintiffs with the secondary upgrades to the Updates and failed to notify Plaintiffs of same.

179.     Defendants breached their duty when they failed to provide proper technical support to Plaintiffs.

180.     As a direct and proximate result of the negligence of the Defendants, Plaintiffs have suffered damages, as set forth herein.

## II.     NEGLIGENT TRAINING:

181.     Plaintiffs incorporate all of the foregoing statements and allegations as though fully restated herein.

182.     Defendants had a duty to train and supervise their contractors, agents, and employees in connection with the integration and operation of the Updates, so as to ensure the Updates would work in a proper manner as described herein- and to provide Plaintiffs with proper technical support services.

183.     As alleged above, Defendants failed to properly train and supervise their contractors, employees, and agents, thus proximately causing the malfunction of the Updates.

184.     Defendants' failure to train their agents and employees caused Plaintiffs to fail to receive proper Updates at inception, to not receive notice of malfunctions, to not receive notice of the required secondary upgrades and to fail to receive a remedy to the issues with Register #2, about which they called Defendants for many months, to no avail.

185.     As a direct and proximate result of the Defendants' negligent supervision and training, Plaintiffs were damaged as set forth herein.

## III.   NEGLIGENT FAILURE TO WARN:

186.     Plaintiffs incorporate all of the foregoing statements and allegations as though fully restated herein.

187.     The Defendants manufactured, distributed, developed, and installed the Updates to Plaintiffs' systems, as set forth herein.

188.     Defendants knew and should have known that there was a malfunction in the Updates and that said malfunction was likely to cause damages to Plaintiffs.

189.     Defendants knew, and should have reasonably known, that Plaintiffs would not have realized the damage the Upgrades would cause and would have no way of independently so realizing.

190.     Any other similarly situated developer, manufacturer, or service provider would have warned of the glitches in the Updates.

191.     Defendants were unreasonable in failing to warn Plaintiffs of the glitches and malfunctions and were negligent in not informing Plaintiffs of secondary updates to the Updates.

192.     Defendants' failure to warn was a substantial factor in, and the direct and proximate cause of, the resultant damages caused to Plaintiffs, as set forth herein.

## IV.   BREACH OF CONTRACT:

193.     Plaintiffs incorporate all of the foregoing statements and allegations as though fully restated herein.

194.    The parties contracted to do business with Defendants Shell and TNE, pursuant to written agreements which were expressly and constructively ratified.

195.    An essential term of the agreements is that Defendants are to provide and supply functioning EPOS and credit card processing systems and upgrades thereto- and that Plaintiffs are to rely on Defendants as outlined in herein.

196.    Plaintiffs' reliance upon Defendants and upon their decision to retain and effect the services, service providers, equipment and software selected and/or mandated by Defendants is a condition of the agreements between Plaintiffs and Defendants to do business.

197.    Defendants caused and benefitted from Plaintiff's reliance on Defendants' systems, and the software, hardware, service providers and integration mechanisms Defendants chose for them.

198.    At all times Plaintiffs complied with their duties under the contracts between and/or among the parties.

199.    Defendants breached the terms of the contract(s) in that they failed to provide competent service providers, functioning software, and functioning upgrades while requiring Plaintiffs to install and use same to comport with Defendants' systems.

200.    As a direct and proximate result of Defendants' breaches, Plaintiffs were damaged as set forth herein.

## V.    <u>NEGLIGENT MISREPRESENTATIONS & OMISSIONS</u>:

201.    Plaintiffs incorporate all of the foregoing statements and allegations as though fully restated herein.

202.    Defendants represented that the Upgrades were necessary and mandatory for secure payment and credit card processing.

203.    Defendants presented equipment, software, and integration thereof to Plaintiffs as an improvement to their EPOS systems - and sold and/or mandated Plaintiffs purchase an adoption of the Updates.

204.    Defendants represented that the Updates were in good working order and would perform as represented.

205.     Defendants made these representations on repeated occasions beginning on or about February 25, 2020, and consistently through to at least January 5, 2021.

206.     Defendants produced receipts, records, logs and accounts that all indicated the Updates were working properly and that credit card transactions were being finalized, for every transaction on Register #2, from February 25, 2020 until at least January 5, 2021.

207.     All said representations were false and should have been known to be false to Defendants.

208.     By at least May 2020, Defendants had produced secondary upgrades to the Updates based on reports and their knowledge of malfunctions in the Updates.

209.     Defendants concealed information about malfunctions and glitches from the Plaintiffs and concealed the need for secondary upgrades to the Updates.

210.     Defendants had a duty to inform Plaintiffs of the glitches and malfunctions of said Updates and the need for secondary upgrades.

211.     Defendants had a duty to disclose this information to Plaintiffs about the condition of the Upgrades because of their superior position, because of their special relationship and because of the restrictive terms of their agreement with the Plaintiffs.

212.     Defendants knew, intended, foresaw, should have foreseen, and caused Plaintiffs to rely on their representations, omissions, and partial representations, and Plaintiffs were justified in relying on same.

213.     Defendants failed to exercise reasonable care or competence in obtaining information from, relaying information to, and communicating with Plaintiffs.

214.     As a direct and proximate result of Defendants' misrepresentations and omissions Plaintiffs were damaged and injured as set forth herein.

## VI.    **BREACH OF EXPRESS & IMPLIED WARRANTIES:**

215.     Plaintiffs incorporate all of the foregoing statements and allegations as though fully restated herein.

216.     Beginning on or about February of 2020, Plaintiffs made payments to Defendant JF Petrol Group for the Updates in the amount of approximately ninety-thousand dollars ($90,000.00), of which $1682.92 was for software alone, for software, hardware and services issued in coordination with Defendants Shell and Verifone.

217.     Plaintiffs undertook these purchases under the instruction of Defendant TNE.

218.     Defendants created express and implied warranties when they informed Plaintiffs that:

a. The Updates were an improvement and mandatory and were necessary to improve and prevent fraud in credit card processing systems (TNE and Shell, from October 2019 through February 2020);

b. JF Petrol Group were experts (TNE in February 2020);

c. The Updates were merchantable and fit for ordinary purposes (TNE and Shell from October 2019 through February 2020; JF Petrol and Verifone from February 2020 – date of purchase by Plaintiffs- forward);

d. The Updates were fit for the particular purpose of securely processing and integrating EPOS and credit card systems (TNE and Shell from October 2019 through February 2020; JF Petrol and Verifone from February 2020 – date of purchase by Plaintiffs- forward)

e. The Updates were fine, had no issues, and in good working order (Shell, Verifone, TNE, JF Petrol from February 25, 2020 through later March 2020, during repeated phone calls with Plaintiffs. Defendants have records of said calls.)

f. The Updates were properly processing credit card purchases, by way of reports, receipts and logs produced by and from Defendants Verifone, Shell and/or TNE and provided to Plaintiffs every day from February 25, 2020 through January 5, 2021.

219. The Updates, as alleged herein, were intended to provide improved credit card processing systems. Instead, the Updates caused failure of the credit card processing system on Register #2.

220. Plaintiffs notified Defendants of malfunctions in their system within one day of the final step of installation of the Updates- and did so on numerous occasions thereafter.

221. Defendants knew and caused Plaintiffs to rely on express and implied warranties of the Updates' fitness for purpose and merchantability because of their transactional, contractual, and special relationships as outlined above.

222. Defendants, on numerous occasions, informed Plaintiffs that all updates and services providers and equipment were fit for purpose and in good order, that they "worked fine" and that there "no glitches."

223. The Updates were neither worthy of sale nor fit for the ordinary or particular purpose for which they were used.

224. As a direct and proximate result of Defendant(s)' breaches of warranties, Plaintiffs were damaged as set forth herein.

## VII. FRAUDULENT OMISSIONS, FRAUDULENT MISREPRESENTATIONS AND FRAUDULENT CONCEALMENT; FAILURE AND REFUSAL TO DISCLOSE:

225. Plaintiffs incorporate all of the foregoing statements and allegations as though fully restated herein.

226.     Defendants were obligated under Ohio law to make full disclosures so as "to dispel misleading impressions created by a partial revelation of the facts." *Klasa v. Rogers*, 8th Dist., Cuyahoga No. 83374, 2004-Ohio-4490.

227.     This duty arose based on the special relationship between the parties, the restrictive agreements between the parties, Defendants' superior knowledge and Defendants' sole control of Plaintiffs' EPOS and credit card processing systems- and because Defendants caused Plaintiffs to rely on them for this information.

228.     Defendants knew that Plaintiffs had no other source for the systems, services, or information which Defendants controlled, and took advantage of that fact.

229.     In failing to fully disclose information about the Updates to Plaintiffs, Defendants created the false impression that the issues with Register #2 were caused by Plaintiffs or third parties under the control and supervision of Plaintiffs and caused the ongoing detrimental reliance on Defendants and their misrepresentations. This further caused Plaintiffs to undertake exorbitantly costly and detrimental measures to attempt to identify the cause for their financial losses.

230.     Defendants had direct knowledge of defects to the Updates by, or at least by, February 25, 2020- and produced upgrades thereafter to correct the defects in the Updates.

231.     Despite repeated and numerous requests to correct the apparent malfunction to Register #2, none of the Defendants informed Plaintiffs of the malfunction and none of the Defendants informed Plaintiffs of the secondary upgrades to the Updates.

232.     Defendants made false statements and fraudulent concealment when they made the following (false) statements of material fact to Plaintiffs:

   a. The Updates were merchantable and fit for ordinary purpose (TNE and Shell from October 2019 through February 2020; JF Petrol and Verifone from February 2020 – date of purchase by Plaintiffs- forward. Verifone and Shell knew the Updates were not ready or final and should not have been offered or sold to Plaintiffs and those similarly situated);
   b. The Updates were fit for the particular purpose of securely processing and integrating EPOS and credit card systems (Verifone and Shell from October 2019 through February 2020; JF Petrol and Verifone from February 2020 – date of purchase by Plaintiffs- forward. Verifone and Shell knew the Updates were not ready or final and should not have been offered or sold to Plaintiffs and those similarly situated);
   c. The Updates were fine, had no issues, and in good working order (Shell, Verifone, TNE, JF Petrol from February 25, 2020 through later March 2020, during repeated phone calls with Plaintiffs. Defendants have records of said calls); and

      d. When Defendants concealed from Plaintiffs the need for secondary upgrades and that they had developed secondary upgrades to correct malfunctions. (All Defendants beginning at least March 2020).

233.     Nondisclosure and concealment rise to an actionable claim for fraud when Defendants are in a fiduciary relationship with the Plaintiffs, and Defendants had exclusive knowledge of material facts not known to Plaintiffs; and Defendants actively conceal or partially repress a material fact from Plaintiffs, as Defendants did here.

234.     Defendants misrepresented the condition of the Updates, concealed the malfunctions, and concealed notice of the needed upgrades, with the intent to mislead Plaintiffs and so as to avoid remedying Plaintiffs for the damages Plaintiffs suffered as a result of Defendants' defective Updates.

235.     Defendants' false representations, omissions and concealment were made to Plaintiffs with reckless disregard for the falsity of said statements and with reckless disregard for the impact said omissions, concealment and misrepresentation would have on Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following:

1. Direct, consequential, proximate, incidental, punitive, and treble damages, totaling two-million, two-hundred and fifty-five thousand and eight hundred and sixty dollars and ninety-two cents ($2,255,860.92), comprising:

    a. Direct damage from cards not processed, totaling approximately $350,000.00;

    b. Cost of Software, approximately $1,682.92;

    c. Lost income for the hours Plaintiffs closed the business to install and correct malfunctions, approximately $2,000.00;

    d. Increased cost of salaries for employees, approximately $65,000.00;

    e. Plaintiff Deek's time to research and discover the defect, approximately $165,000.00;

    f. Psychological stress to Plaintiff Deek, approximately $65,000.00;

    g. Damage to Plaintiff Deek's new business caused by his absence and lost business opportunity, approximately $400,000.00;

    h. Damage to reputation and goodwill, in an amount to be determined;

    i. Loss of Plaintiff's customers in an amount to be determined;

      j.   An award of attorneys' fees and costs of litigation;

      k.   Punitive and Treble damages in an amount to be determined;

2.  Public apology to Plaintiffs' customers for chargebacks with admission as to the cause for same;

3.  Public apology for the damages caused to Plaintiffs with a statement detailing the nature and duration of the malfunctions and defects in the Updates; and

4.  For all such other and further relief, including equitable relief, as the Court deems just and proper.

Respectfully submitted,

MANNING LAW FIRM, LLC

*/s/ Thomas J. Manning*

_____

Thomas J. Manning (0059759)
P.O. Box 751484
Dayton, OH 45475
(937) 776-4856
(866) 454-6229 (Fax)
tmanning@manninglawfirm.com

*/s/ Lamis J. Deek*

_____

*Pending Admission Pro Hac Vice*
The Law Offices of Lamis Deek
The Chambers Building
277 Broadway 15th Floor
New York, NY 10007
P:212-226-3999
F:631-860-0624
Lamisjamalesq@yahoo.com
Lamisjd@gmail.com

Trial Attorneys for Plaintiffs

## **JURY DEMAND**

Pursuant to Fed R. Civ. P. 38, Plaintiffs hereby demand a trial by jury as to each and every cause of action presented herein.

/s/ Thomas J. Manning

_____

Thomas J. Manning
Trial Attorney for Plaintiff